# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ALLIANCE OPHTHALMOLOGY, PLLC; DALLAS RETINA CENTER, PPLC; TEXAS EYE AND CATARACT, PPLC; AND HOFACRE OPTOMETRIC CORPORATION, on behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

ECL GROUP, LLC; ECL HOLDINGS, LLC; EYE CARE LEADERS HOLDINGS, LLC; EYE CARE LEADERS PORTFOLIO HOLDINGS, LLC; INTEGRITY EMR, LLC; INTEGRITY EMR HOLDINGS, LLC; ALTA BILLING, LLC; AND ALTA BILLING HOLDINGS, LLC,

        Defendants.

_____

KIMBERLY FARLEY, CHAD FORRESTER, and KIMBERLY SANDVIG, on behalf of themselves and others similarly situated,

        Plaintiffs,

v.

EYE CARE LEADERS HOLDINGS, LLC,

        Defendant.

1:22-CV-296

1:22-CV-468

## MEMORANDUM OPINION, ORDER, and FINAL JUDGMENT

Catherine C. Eagles, Chief District Judge.

This matter is before the Court on a joint motion for final approval of a proposed settlement agreement under Federal Rule of Civil Procedure 23(b)(1)(B) and on related motions for fees and expenses. The Court has considered the record, the proposed settlement agreement, the supporting documents, the representations by counsel during the fairness hearing and previous hearings, and the absence of objections. The proposed settlements meet the requirements of Rule 23 and the requested attorneys' fees, expenses, and representative awards are appropriate. Based on the following findings of fact and conclusions of law, the motion for final approval will be granted.

## I. Background

### A. The Claims

In June 2022, several patients of ophthalmology practices sued Eye Care Leaders Holdings, LLC ("ECL"), the entity that provides medical records platforms and patient management software to eye care clinics and whose data systems were breached, exposing plaintiffs' personal information. In a consolidated class action complaint, the plaintiffs brought claims for negligence, negligence *per se*, invasion of privacy, unjust enrichment, and breach of fiduciary duty. Doc. 31 at ¶¶ 126–189.[1] ECL's motion to dismiss was denied, Doc. 46, and discovery began. *See* Doc. 48 (authorizing discovery).

---

[1] All citations are to the docket in *Farley v. Eye Care Leaders Holdings, LLC*, No. 22-CV-468, unless otherwise noted.

ECL and related entities also face a separate lawsuit brought by some ophthalmology practices with which it had contracts, again as a proposed class action. Complaint, *All. Ophthalmology, PLLC et al. v. ECL Grp., LLC*, No. 22-CV-296, Doc. 1 (M.D.N.C. Apr. 15, 2022). These plaintiffs sued ECL for breach of contract, based largely on an alleged failure to keep patient data secure and to provide discounts when the platform was offline, as well as for fraud and unfair trade practices based on alleged misrepresentations about the ransomware attacks. *Id.* at 1−2 (summarizing claims). ECL's motion to dismiss was denied. Order, *All. Ophthalmology*, No. 22-CV-296, Doc. 30 (M.D.N.C. Mar. 6, 2023). Additional plaintiffs and defendants were later added in a second amended complaint. Second Amended Class Action Complaint, *All. Ophthalmology*, No. 22-CV-296, Doc. 35 (M.D.N.C. May 1, 2023).

Because the defendants' assets are tied up in a receivership and they have large-scale financial obligations to others not involved in this litigation and because discovery was likely to be expensive, informal discovery and settlement discussions began soon after the denials of the motions to dismiss. Doc. 53; Doc. 60; Doc. 67 at 16−18. The parties sought court assistance, Doc. 53, and a mediated settlement conference was held with Magistrate Judge L. Patrick Auld. Text Order 03/22/2023; Minute Entry 04/10/2023. The parties reached a framework for agreement, Minute Entry 04/10/2023, and all cases were consolidated for settlement purposes. Doc. 61.

### B. The Settlement Terms and Preliminary Approval

On July 28, 2023, the parties filed a joint motion for preliminary certification of the settlement classes and for preliminary approval of the settlement agreement. Doc. 66.

3

The attached settlement agreement, Doc. 67-1, when approved, will create a $1,460,449.50 settlement fund for a "Physician Settlement Class," which includes four subclasses, and a $2,616,783 settlement fund for a "Patient Settlement Class." Doc. 67 at 19;[2] *see* Doc. 67-1 at ¶ 2.37 (defining classes). The Physician Settlement Class will also receive some credits against any money owed to the defendants and other non-cash benefits. Doc. 67-1 ¶ 3.2. The settlement agreement calls for the named plaintiffs in each class to receive specified class service awards and for attorneys' fees to be limited to a set percentage, subject to court approval. Doc. 67 at 21; Doc. 67-1 at ¶ 5.1.

The "Physician Settlement Class" includes all ophthalmology practices that licensed the defendants' electronic medical records ("EMR") and billing software during the outages caused by the ransomware attacks and includes four subclasses defined by the entity with whom the practice had a contract. Doc. 67-1 at ¶ 2.37(b)–(f). The "Patient Settlement Class" includes all patients whose personal information was exposed during the data breaches that resulted from those attacks. *Id.* at ¶ 2.37(a).

All of the defendants' assets are tied up in state court receivership actions, leaving only insurance coverage as a source of recovery. *See, e.g.*, Doc. 67-10. The cash settlement will be funded with proceeds of insurance policies issued to ECL by Hiscox, Inc. and Travelers Property Casualty Co. of America. *See* Doc. 67 at 15, 17–18; Doc. 67-10 at ¶¶ 8–9. Both policies are "wasting" or "eroding" policies that are reduced as

---

[2] For simplicity, the Court has sometimes cited the parties' brief in support of preliminary approval rather than the settlement agreement itself. But the Court has confirmed that the brief accurately summarizes the agreement.

expenses of defense are incurred.  Doc. 67-10 at ¶¶ 8–9.  All available insurance funds are being contributed to fund the settlement.  Doc. 67 at 19.  There are two other policies that potentially provide coverage for claims by the Physician Settlement Class, but both insurers have denied coverage.  Doc. 67-10 at ¶¶ 10–11.

For the Patient Settlement Class only, members who submit a valid claim for out-of-pocket expenses up to $5,000, as determined by the Claims Administrator, will be reimbursed; then the remainder of the Patient Class Settlement Fund, less fees and expenses, will be distributed *pro rata* to class members.  Doc. 67-1 at ¶ 3.5.  The Patient Settlement Class will release its claims against the Physician Settlement Class in exchange for the Physician Settlement Class accepting a smaller settlement fund.  *Id.* at ¶ 3.1; Doc. 67 at 19−20.

Members of the Physician Settlement Class will receive a *pro rata* share of their settlement fund, after payment of expenses and fees.  Doc. 67-1 at ¶ 3.5.  The defendants also agree to assign two other potential sources of insurance coverage to the Physician Settlement Class; if any insurance funds are obtained under these policies, 67% of the funds will be contributed to the Physician Class Settlement Fund to be distributed equally to valid claimants, with the remaining funds used to pay counsel for the Physician Settlement Class.  *Id.* at ¶¶ 3.3–3.4; Doc. 67 at 20.  The defendants also agree to provide account credits to certain members of the Physician Settlement Class, to cease collection efforts related to unpaid invoices for periods with service interruption, and to allow members of the Physician Settlement Class to terminate contracts without penalty and with data provided in a useable format.  Doc. 67 at 20; Doc. 67-10 at ¶¶ 13–14.

5

The settlement agreement does not specifically call for non-opt-out classes, Doc. 67-1, but the joint motion for preliminary certification was made pursuant to Federal Rule of Civil Procedure 23(b)(1)(B), Doc. 66 at 2, the rule that binds all class members to the result without opportunity to opt out. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833 (1999) (recognizing that Rule 23(b)(1)(B) permits "certification of a class whose members have no right to withdraw"). Because the defendants have no funds to pay a settlement or judgment, the insurance funds available to satisfy the judgment are limited, and there are competing class actions and a potential for future class actions, including by the Patient Settlement Class against the Physician Settlement Class, the parties believe that non-opt-out classes are necessary to prevent individual plaintiffs from bringing actions that would effectively be dispositive of actions by other class members, cutting off their ability to recover. Doc. 67-13 at ¶ 13. They also believe non-opt-out classes are necessary to avoid further litigation that would result in wasting of the limited, remaining insurance funds on the cost of defense instead of on compensating the class members for their damages. *Id.* The parties' goal in requiring a non-opt-out provision is to ensure complete resolution of the litigation and a fair distribution of the available insurance proceeds. Doc. 67 at 19.

After a hearing about the proposed settlement agreement on August 16, 2023, Minute Entry 08/16/2023, the Court granted the parties' joint motion for preliminary certification of the settlement classes and preliminary approval of the class action settlement, Doc. 66, on August 23, 2023. Doc. 71. The Court held that preliminary certification of the mandatory, non-opt-out settlement classes was appropriate, given the

6

limited funds available to satisfy the judgment and because the class as a whole was given the best deal that will allow everyone with a common claim to be satisfied from the limited fund. *Id.* at 5–9. The Court found that the proposed settlement was likely to receive final approval, preliminarily certified the requested settlement classes, appointed separate class counsel for the Patient and Physician Settlement Classes, appointed class representatives, and appointed a Claims Administrator. *Id.* at pp. 17–20 ¶¶ 1–5.

The Court ordered the defendants to access their records for the names and contact information of members of the Patient Settlement Class and to disclose such information to the Settlement Administrator. *Id.* at p. 20 ¶ 6. The Court also ordered the parties to submit a notice plan to the Court by September 5, 2023. *Id.*

### C.     Notice and Other Procedural Developments

On September 5, 2023, the parties filed a joint motion seeking approval of a proposed notice plan. Doc. 72. The Court had questions about the notice plan and proposed notice documents, Doc. 73, and directed the parties to revise the notice plan to resolve those concerns. Text Order 09/30/2023. The parties submitted revised notice plan documents, Doc. 74, which the Court approved with minor edits. Doc. 75. The Court appointed Epiq Class Action and Claims Solutions, Inc. as the Settlement Administrator, *id.* at p. 3 ¶ 4, and ordered Epiq to file a declaration under oath by January 29, 2024, showing compliance with the notice plan and providing an assessment of the number of notices delivered and returned. *Id.* at p. 4 ¶ 11.

In January 2024, after receiving notice that certain defendants were in bankruptcy, the Court stayed the case. Text Order 01/30/2024; Text Order 01/31/2024. During the

7

bankruptcy proceedings, the proposed purchaser of the defendants' assets opposed the Physician Settlement Class Counsel's request that the buyer be required to honor the Physician Settlement Class's rights under the proposed settlement agreement. Doc. 88-1 at 1–3. These included the Class's rights to 1) receive contractual credits; 2) terminate the underlying contracts and receive transition assistance; and 3) be free from collection efforts for invoice months in which there was a service outage. Doc. 67-1 at ¶ 3.2. The Physician Settlement Class Counsel filed a limited objection to the motion to approve the bankruptcy sale and represented the class at an evidentiary hearing. Doc. 88-2 at ¶¶ 20–32; Doc. 88 at 6.

Thereafter, the U.S. Bankruptcy Court for the Northern District of Texas approved the sale and expressly ordered the proposed purchaser to honor the Physician Settlement Class's rights to receive contractual credits, terminate the underlying contacts, and receive transition assistance. Doc. 88-3 at ¶ 48. On April 22, 2024, the Bankruptcy Court entered an order lifting the automatic stay to allow final approval and implementation of the class action settlement. Doc. 80.

Upon the lifting of the stay, this Court revised the notice plan timeline, Doc. 81, and set a new May 28, 2024, deadline for the Settlement Administrator to provide its declaration about the notice plan execution. *Id.* at 2. The Court also scheduled a fairness hearing for June 24, 2024. Doc. 82.

On May 28, 2024, the plaintiffs filed the Settlement Administrator's declaration addressing notice plan implementation. Doc. 83. The Settlement Administrator provided notice in compliance with the order, including by personal email to potential class

8

members, limited postal mail to some potential Physician Settlement Class Members, a public website, and an internet campaign. Specifically, the Settlement Administrator:

-- sent email notices to 4,629,204 potential Patient Settlement Class Members and to 12,310 potential Physician Settlement Class Members. *Id.* at p. 5 ¶ 15.

-- sent 479 postcard notices to potential Physician Settlement Class Members for whom a valid email address was either not available or for whom the email notice was undeliverable after multiple attempts. *Id.* at p. 6 ¶ 18.

-- established a dedicated website about the settlement that included copies or links to all relevant case related materials, including the settlement agreement, which over 44,000 visitors accessed. *Id.* at p. 10 ¶ 31.

-- implemented a targeted but extensive internet digital notice campaign that generated 71,400,000 million impressions. *Id.* at pp. 7–9 ¶¶ 22–30.

Notice either by email or mail was successfully delivered to over 90% of identified potential Physician Settlement Class Members. *Id.* at p.7 ¶ 20. At the June 24, 2024, hearing, counsel represented that email notice was successfully delivered to over 80% of identified potential Patient Settlement Class Members.

The deadline to file objections to the settlement was initially set as January 15, 2024. Doc. 75 at p. 4 ¶ 10 (listing correct month and day but incorrect year); Text Order 10/18/2023 (correcting order to reflect upcoming year 2024). It was extended to May 24, 2024, for Physician Settlement Class Members who were sent a Postcard Notice to ensure they had sufficient time to object to the settlement. Doc. 81 at 2. No one objected to the Settlement. Doc. 83 at p. 11 ¶ 34.

9

The deadline for class members to file claims is July 24, 2024. Doc. 81 at 2. As of May 28, 2024, 8,902 Patient Claim Forms and 199 Physician Claim Forms had been filed. Doc. 83 at p. 11 ¶ 35.

Counsel for the Patient Settlement Class filed a motion for attorney fees, expenses, and service awards on May 31, 2024. Doc. 84. Counsel for the Physician Settlement Class filed a separate motion for attorney fees, expenses, and service awards that same day. Doc. 89. The parties also filed a joint motion for final approval of the class action settlement and for certification of the Rule 23(b)(1)(B) classes. Doc. 87.

The fairness hearing was held on June 24, 2024, as scheduled. Minute Entry 06/24/2024. Counsel for each class attended, as did counsel for ECL. Counsel advised the Court about settlement administration costs, the success of the notice program, the bankruptcy proceedings, and other details. The Court expressed its view that any settlement of the insurance claims assigned to the Physician Settlement Class would likely require court oversight, and Physician Class Counsel agreed to provide that information if and when either claim is settled.

## II.     Certification of Settlement Classes

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up). To qualify for the exception, the plaintiffs "must affirmatively demonstrate [their] compliance" with Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006) (stating "district courts must

10

conduct a rigorous analysis to ensure compliance with Rule 23" (cleaned up)); *see generally* FED. R. CIV. P. 23(a).

A.     **Readily Identifiable Class Members and Class Representatives**

As a threshold matter, Rule 23 requires the proposed class members be readily identifiable and the proposed class representatives be members of the proposed class. *See Peters v. Aetna Inc.*, 2 F.4th 199, 241–42 (4th Cir. 2021) (recognizing an "implicit threshold requirement" that class members be readily identifiable); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) ("A class representative must be part of the class." (cleaned up)).  Both requirements are met here.

The settlement agreement calls for certification of two settlement classes, a patient class and a physician class made up of four subclasses.  Doc. 67-1 at ¶¶ 2.37; 6.1–6.2.

The proposed "Patient Settlement Class" is defined as follows:

> [A]ll individuals residing in the United States whose PII [personally identifiable information] or PHI [personal health information] was compromised in the Data Breaches affecting one or more Defendants, including all persons who received notice about the Data Breaches.

*Id.* at ¶ 2.37(a).

The proposed "Physician Settlement Class" means:  "the iMedicWare Class, myCare Integrity Class, MVE Class, and Revenue Cycle Management Class, collectively."  *Id.* at ¶ 2.37(f).  The iMedicWare Class is defined as:

> [A]ll persons and entities who contracted with one or more Defendants for EMR [electronic medical record] management services using the iMedicWare software, and who have suffered Outages for any period of time since January 1, 2019, due to ransomware attacks or any other reasons.

11

*Id.* at ¶ 2.37(b). The myCare Integrity Class is defined as:

> [A]ll persons and entities who contracted with one or more Defendants—and received services from Integrity EMR, LLC and Integrity Holdings, LLC—for EMR management services using the myCare Integrity software, and who have suffered Outages for any period of time since January 1, 2019, due to ransomware attacks or any other reasons.

*Id.* at ¶ 2.37(c). The MVE Class is defined as:

> [A]ll persons and entities who contracted with one or more Defendants for EMR management services using the MVE software, and who have suffered Outages for any period of time since January 1, 2019, due to ransomware attacks or any other reasons.

*Id.* at ¶ 2.37(d). The Revenue Cycle Management Class is defined as:

> [A]ll persons and entities who contracted with one or more Defendants—and received services from Alta Billing, LLC and Alta Billing Holdings, LLC—for revenue cycle management services who have received delinquent revenue cycle services for any period of time since January 1, 2019 and/or whose transaction information was potentially compromised from ransomware attacks or any other reasons.

*Id.* at ¶ 2.37(e). The defendants had the information needed to identify all members of both settlement classes, and they provided the Settlement Administrator with the names and contact information of more than 4.6 million potential Patient Settlement Class Members and 8,696 potential Physician Settlement Class Members. Doc. 83 at pp. 4–5 ¶¶ 12–14.

The proposed class representatives are members of the settlement classes they seek to represent, have the same interests as the respective class, and allege the same injury as the class members. Doc. 67 at 27. The Patient Settlement Class representatives, Kimberly Farley, Chad Forrester, Kimberly Sandvig, Detrina Solomon, and Jeanne Byers,

all suffered from the same data breach that exposed the PII and PHI of the class members. *See, e.g.*, Doc. 31 at 18–22; Doc. 67-12 at ¶¶ 10–12. The Physician Settlement Class representatives, Alliance Ophthalmology, PLLC; Dallas Retina Center, PLLC; Texas Eye and Cataract, PLLC; Hofacre Optometric Corporation; Shulkin Eye Associates; Gorden Eye Associates PA; Regional Eye Associates, Inc; Eye Associates, LLC; and SurgiCenter of Vineland Holdings, LLC, are medical providers who had contracts with the defendants to maintain patient records and who suffered from the same ransomware attacks and false representations of the defendants as the other class members. *See, e.g.*, First Amended Complaint, *All. Ophthalmology*, No. 22-CV-296, Doc. 14 at 1–3; Doc. 67-1 at ¶ 2.14. The Rule 23 threshold requirements are met.

## B. Rule 23(a) Requirements

Plaintiffs must also establish the four enumerated requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Peters*, 2 F.4th at 241 (citing FED. R. CIV. P. 23(a)). "These four requirements effectively limit the class claims to those fairly encompassed by the named plaintiffs' claims." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) (cleaned up).

### 1. Numerosity

Rule 23(a) requires that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). While "no specified number is needed to maintain a class action, . . . a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (cleaned up). The Physician Settlement Class has

potentially up to 8,696 members. Doc. 83 at p. 5 ¶ 14. The Patient Settlement Class, which is comprised of the practices' patients, has potentially more than 4.6 million individuals. *Id.* at p. 4 ¶ 12. Joinder of over 4.6 million plaintiffs would be impracticable. *See* FED. R. CIV. P. 23(a)(1). The settlement classes easily satisfy the numerosity requirement.

### 2. Commonality

To satisfy the commonality requirement, there must be "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart*, 564 U.S. at 349–50 (cleaned up). A single common question is enough if it is "of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (quoting *id.* at 350); *see also Carolina Youth Action Project; D.S. ex rel. Ford v. Wilson*, 60 F.4th 770, 780 (4th Cir. 2023) (finding commonalty requirement satisfied when a common contention is capable of class wide resolution). Here, common questions of law and fact exist.

The Physician Settlement Class's breach of contract claims rest on provisions that were common to all the defendants' licensing agreements. *See* Second Amended Class Action Complaint, *All. Ophthalmology*, No. 22-CV-296, Doc. 35 at ¶¶ 25, 39. Among the named physician-group plaintiffs, there is at least one practice that purchased each of the defendant's EMR and revenue-cycle management products at issue. *See, e.g., id.* at ¶¶ 21, 23–24. Likewise, the Physician Settlement Class's claims for negligence, breach

14

of contract, fraud, and unfair trade practices all turn on conduct that was common to the proposed class—*i.e.*, that the defendants failed to secure against the ransomware attacks and, once those attacks occurred, falsely represented that the outages were the result of mere technical issues and failed to timely notify the practices affected by the ransomware attacks. *Id.* at ¶¶ 132, 137–147, 156–210.

The Patient Settlement Class's claims for negligence, invasion of privacy, unjust enrichment, and breach of fiduciary duty likewise seek to recover for damages resulting from the same alleged conduct. Doc. 31 at ¶¶ 126–189. There are myriad common questions of law and fact about the Patient Settlement Class, such as whether ECL owed a duty to protect and secure the private information of the patients, whether ECL breached that duty, whether ECL maintained reasonable security procedures and practices appropriate to the nature of storing the private information of patients, and whether patients have actionable claims against ECL. These common questions of law and fact arise from the same data breaches.

### 3. Typicality

To satisfy the typicality requirement, "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The typicality requirement is met where 'the claims asserted by the named plaintiffs arise from the same course of conduct and are based on the same legal theories as the claims of the unnamed class members.'" *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 65 (M.D.N.C. 2008). "The typicality requirement goes to the heart of a representative parties' ability to represent a class," and the named plaintiffs' interest in prosecuting their

cases "must simultaneously tend to advance the interests of the absent class members." *Dieter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).

Here, the typicality requirement is met. The claims of the named plaintiffs are typical of the claims of the class members because the claims asserted arise from the same data breaches. *See Tatum*, 254 F.R.D. at 65. The named plaintiffs also advance the interests of the absent class members because they allege the same injuries and legal harms any class member would raise.

### 4. Adequacy of Representation

Rule 23 requires that the class representatives "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent," as well as "competency and conflicts of class counsel." *Amchem*, 521 U.S. at 625, 626 n.20; *see also Wal-Mart*, 564 U.S. at 349 n.5. Here, the plaintiffs satisfy both requirements.

First, there does not appear to be a meaningful or actual conflict of interest between the named plaintiffs and putative class members they represent. The named plaintiffs for both settlement classes are members of their respective classes and, for the Physician Settlement Class, of the subclasses (iMedicWare Class, myCare Integrity Class, MVE Class, and Revenue Cycle Management Class) they seek to represent. They possess the same interests as the class and allege that they suffered the same injury as the class members as a result of the same alleged conduct. *See Amchem*, 521 U.S. at 625–26. While there is the potential for conflict between and among the physician subclasses, in

16

reality on the facts here, those conflicts are non-existent, given the limited funds available and the mutual interest of all members of the Physician Settlement Class in obtaining some recovery before insurance proceeds are exhausted by defense costs.

Second, the representatives are adequate. There are separate representatives for each class, and each class has its own independent counsel. The attorneys representing the Patient Settlement Class and the Physician Settlement Class have extensive experience in class action litigation. Doc. 67-12 at ¶¶ 2–7; Doc. 67-13 at ¶¶ 3–6. Patient Settlement Class lead counsel has more than two decades of experience with complex litigation, including consumer class actions, and together the counsel team has notable experience in class actions involving data breach litigation. Doc. 67-12 at ¶¶ 2–7. Physician Settlement Class Counsel have more than 35 years of combined experience in business and complex litigation, including class actions involving medical record data. Doc. 67-13 at pp. 2–4 ¶¶ 3–6. The named plaintiffs and counsel have zealously and ably represented the interests of the plaintiffs and the settlement classes, under very complex circumstances.

As noted *supra*, there is no actual conflict between or among the settlement classes. There are different insurance policies with different coverage funding the settlements of the two classes, and the physician subclasses are treated equally. Doc. 67 at 3, 17–19; Doc. 67-10 at ¶¶ 8–9. During settlement negotiations, the classes were represented by their own independent counsel, Doc. 67 at 16–17, and the Patient Settlement Class agreed to release its claims against the Physician Settlement Class in exchange for the latter class accepting a smaller settlement fund. *Id.* at 19–20; Doc. 67-1

17

at ¶ 3.1.  Moreover, as already explained, *see supra* at 6–7, the settlement structure that includes mandatory, non-opt-out classes was designed to ensure that all class members are treated fairly and can receive some compensation for their damages.  Specifically, the non-opt-out class structure prevents individual plaintiffs from bringing actions that would effectively be dispositive of actions by other members of the class; it also ensures the limited funds are available to pay class members, not used for litigation expenses.  Doc. 67-13 at ¶ 13.

### C.    Certification Under Rule 23(b)(1)(B) Due to Limited Funds

To obtain class certification, the plaintiffs must establish that the case fits into at least one of the three subsections of Rule 23(b).  *Comcast*, 569 U.S. at 33.  Rule 23(b)(1)(B) permits:

> certification of a class whose members have no right to withdraw, when "the prosecution of separate actions . . . would create a risk" of "adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."

*Ortiz*, 527 U.S. at 833 (quoting in part FED. R. CIV. P. 23(b)(1)(B)).  Certification of a mandatory class is appropriate when there is a "limited fund" with insufficient resources to satisfy the claims of all the members of the proposed class.  *See Herrera v. Charlotte Sch. of Law, LLC*, 818 F. App'x 165, 172 (4th Cir. 2020).[3]

---

[3] *Herrera* is unpublished and non-precedential, but it largely relies on Supreme Court precedent in *Ortiz*.  The Court finds it persuasive.

The Supreme Court has held that in addition to demonstrating insufficiency of funds, it is "presumptively necessary, and not merely sufficient" for the district court to find that: (1) "the class as a whole was given the best deal, and that the limited fund did not give a defendant a better deal than *seriatim* litigation" and (2) "the claimants identified by a common theory of recovery were treated equitably among themselves." *Id.* at 172–73 (cleaned up) (citing *Ortiz*, 527 U.S. at 838–39).

The defendants here are caught up in the legal difficulties of Greg Lindberg. He and his businesses have faced or are facing multiple civil lawsuits in this district,[4] and after a retrial, Mr. Lindberg was convicted in the Western District of North Carolina on criminal charges for attempting to bribe the state Commissioner of Insurance. *See* Verdict Form, *United States v. Lindberg*, No. 19-CR-22, Doc. 435 (W.D.N.C. May 16, 2024); *see also United States v. Lindberg*, 476 F. Supp. 3d 240 (W.D.N.C. 2020) (denying the defendants' post-verdict motions after first trial), *vacated and remanded for new trial*, 39 F.4th 151 (4th Cir. 2022).

Mr. Lindberg allegedly funded the operations of the defendants here and other businesses using assets that belonged to several insurance companies once owned and operated by Mr. Lindberg. *See generally* Doc. 67-3 at 40 (listing companies affiliated with Mr. Lindberg); Doc. 67-4 at ¶¶ 18, 23–25. Those insurance companies are now

---

[4] *See, e.g., United States v. Lindberg*, No. 22-CV-911 (M.D.N.C.) (dismissed); *Glob. Growth, LLC v. Causey*, No. 20-CV-248, 2021 WL 111494 (M.D.N.C. Jan. 12, 2021); *Universal Life Ins. Co. v. Lindberg*, No. 20-CV-681 (M.D.N.C.); *Local Web Results, Series LLC v. Eli Glob., LLC*, No. 21-CV-206 (M.D.N.C.) (judgment entered and case terminated); *Jordan v. Lindberg*, No. 22-CV-483 (M.D.N.C.) (case stayed); *U.S. Sec. & Exch. Comm'n v. Lindberg*, No. 22-CV-715 (M.D.N.C.).

subject to rehabilitation proceedings in North Carolina State Court, *see generally* Doc. 67-10 at ¶ 4, and, as a result of orders issued in those proceedings, the defendants here must use all available resources to repay the insurance companies approximately $1.275 billion. *Id.* Because of the state court receivership orders, the defendants cannot liquidate any assets or use their assets to satisfy any claims by the plaintiffs in this litigation. *Id.* at ¶ 6.

The bankruptcy proceedings imposed further obstacles. As counsel explained at the fairness hearing, while the assets of some of the defendants have been sold, the sale proceeds are less than claims of secured creditors. The classes here are unsecured creditors. While it is possible some recovery for the classes can be obtained in the bankruptcy proceedings from the sale proceeds, that is highly uncertain and unlikely to be substantial.

This effectively means that the only assets available to pay the settlement classes' claims are the proceeds of insurance policies purchased by the defendants. There are four such policies, two of which have been tendered. *Id.* at ¶¶ 7–9. Both of these policies are subject to wasting clauses, which means that the amounts available to satisfy the claims of the plaintiffs and others affected by the data breach would be reduced by litigation expenses. *Id.* at ¶¶ 8–9. There are two other policies, but both those insurers have so far denied coverage. *Id.* at ¶¶ 10–11.

The defendants have provided financial records to plaintiffs' counsel confirming the lack of assets to satisfy their liabilities, *id.* at ¶ 16, and the settlement agreement requires them to provide current documentation confirming it. Doc. 67-1 at ¶ 9.1.

20

Counsel for both settlement classes have each independently evaluated the availability of other assets and have satisfied themselves that the insurance proceeds are the only hard assets from which any judgment could be satisfied. Doc. 67-12 at ¶ 21; Doc. 67-13 at ¶ 11. The settlement does not give any defendant a better deal than *seriatim* litigation.

The claims of the Physician Settlement Class alone, conservatively estimated, would exceed the entirety of the tendered insurance proceeds several times over. Doc. 67 at 6–7.[5] There were several million potential members of the Patient Settlement Class, and even nominal damages of one dollar each would thus well exceed the total funds available. *Id.* at 8–9; Doc. 83 at p.5 ¶ 15.

The proposed settlement gives the classes as a whole the best deal possible in light of the limited funds available. The two settlement classes have independent, experienced counsel who are well-versed in complex class action litigation, Doc. 67-12 at ¶¶ 2–7; Doc. 67-13 at ¶¶ 1–7, and counsel for each class attest that if this settlement is not approved as a limited fund, non-opt-out class settlement, it is unlikely that there will be any appreciable funds to distribute, resulting in inequitable distribution. Doc. 67-12 at ¶¶ 20–21; Doc. 67-13 at ¶ 13. Physician Settlement Class Counsel also attest that the proposed "settlement amount negotiated with the Defendants represents the most that

---

[5] Counsel represent that aggregate damages for contractual refunds to the Physician Settlement Class Members would be at least $5.3 million. Doc. 67 at 6–7. The physicians also have claims for lost revenue, which the plaintiffs estimate at approximately $9,000 per day per physician. *Id.* at 31–32. Even at a small percentage of that rate, the damages would be in the many millions. *Id.* at 31–32 & n.8–10. The two tendered policies total approximately $4.1 million. Doc. 67-10 at ¶¶ 8–9. If full coverage were obtained under the other two policies, an additional $9 million would be available. *Id.* at ¶¶ 10–11. The insured parties under those other two policies are defendants in the case brought by the Physician Settlement Class. *See* Doc. 67-1 at ¶¶ 3.3–3.4.

21

could be contributed." Doc. 67-13 at ¶ 11. The defendants further offered non-cash benefits to Physician Settlement Class members and those benefits, including assignment of interests in two insurance policies, are substantial.

The class members are treated equitably among themselves under the settlement, as discussed in more detail, *supra* at 16–18. The settlement classes are clearly defined. Doc. 67-1 at ¶ 2.37. At least one court has approved Rule 23(b)(1)(B) mandatory classes in cases where the only available assets are insurance policies. *See Herrera*, 818 F. App'x at 171–72, 179 (affirming approval of limited fund settlement where remaining insurance policies, with minor exception, represented defendant's only real assets).

## III. Final Settlement Approval

"It has long been clear that the law favors settlement." U*nited States v. Manning Coal Corp.*, 977 F.2d 117, 120 (4th Cir. 1992). That preference is especially true in class actions. *See In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998); *Reed v. Big Water Resort, LLC*, No. 14-CV-1583, 2016 WL 7438449, at *5 (D.S.C. May 26, 2016) (quoting same); WILLIAM B. RUBENSTEIN, 4 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 13.44, n.1 (6th ed. 2022) (collecting cases); *Glymph-Dozier v. Grapevine of N.C., Inc.*, No. 21-CV-748, 2023 WL 3020877, at *4 (M.D.N.C. Apr. 20, 2023).

### A. Rule 23 Settlements

Courts may approve a class settlement only if it is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). Courts in this circuit bifurcate the analysis into "consideration of fairness, which focuses on whether the proposed settlement was negotiated at arm's

22

length, and adequacy, which focuses on whether the consideration provided the class members is sufficient." *Roldan v. Bland Landscaping Co.*, No. 20-CV-276, 2022 WL 17824035, at *2 (W.D.N.C. Dec. 19, 2022) (cleaned up); *see also Beaulieu v. EQ Indus. Servs., Inc.*, No. 6-CV-400, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009) (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991)). The Court acts as a fiduciary of the class members. *Sharp Farms v. Speaks*, 917 F.3d 276, 293–94 (4th Cir. 2019); *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 525 (4th Cir. 2022).

### 1. Fairness

The fairness analysis aims "to ensure that a settlement is reached as a result of good faith bargaining at arm's length, without collusion." *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015) (cleaned up). Courts apply a four-factor test to determine the fairness of a proposed settlement: "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area [of the law at issue]." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158–59; *accord 1988 Tr.*, 28 F.4th at 525 (applying same standard).

Here, all four fairness factors support final approval. The plaintiffs initiated this litigation two years ago, and while the parties worked cooperatively, they negotiated at arm's length, including through a Magistrate Judge mediator. *See* Text Order 03/22/2023; Minute Entry 04/10/2023. Due to the limited funds available to accomplish settlement and the costs of litigation and discovery, which would reduce those limited funds further,

23

the parties entered mediation and settlement negotiations quickly after denial of motions to dismiss. *See* Doc. 53; Doc. 60; Doc. 67 at 16. The parties reached agreement for a framework for settlement, Minute Entry 04/10/2023, and all cases were consolidated for settlement purposes. Doc. 61. There is no indication of any collusion or improper conduct, and there is no actual conflict between or among the settlement classes, given that each class will recover through separate insurance policies, Doc. 67 at 3, 17–19, and that the settlement structure includes non-opt-out classes designed to ensure that all class members are treated fairly and are able to recover. While the classes and class members certainly have conflicting interests if the case continues to be litigated, those conflicts and differences dissolve in the face of the realities of this case.

The parties did not engage in formal written discovery or depositions but worked cooperatively to conduct informal discovery to facilitate settlement negotiations while limiting expenses. *See id.* at 16; Doc. 52 at 1–2. In advance of the judicial settlement conference, the defendants produced "copies of all potentially applicable insurance agreements" as well as "information about their assets and liabilities," which allowed the parties to submit "confidential settlement conference briefs in which they discussed both the strengths and weaknesses of their cases." Doc. 67 at 16, 39. As previously discussed, counsel representing the two Settlement Classes have extensive experience in class action litigation. *See supra* at 17–18; Doc. 67-12 at ¶¶ 2–7; Doc. 67-13 at ¶¶ 1–7.

### 2. Adequacy and Reasonableness

To assess the adequacy of a proposed settlement, courts consider the following factors:

(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*Sharp Farms*, 917 F.3d at 299 (quoting *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159).

Typically, "[t]he most important factors in this analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses." *Id.* But when the case involves a Rule 23(b)(1)(B) limited fund class certification, the dominant issues may instead be the expense of litigation and the likelihood of recovery. *Herrera*, 818 F. App'x at 177. Lastly, in assessing reasonableness, the court examines "the amount of the settlement" and "ensures that the amount on offer is commensurate with the scale of the litigation and the plaintiffs' chances of success at trial." *1988 Trust*, 28 F.4th at 527.

The relevant factors support approval. As discussed in detail, *see supra* at 4–5, 20–21, the state court proceedings and judgments prevent the defendants from liquidating any assets or using their assets to satisfy any claims by the plaintiffs, *see* Doc. 67-10 at ¶ 6, and the bankruptcy temporarily further complicated the possibility of recovery. The only assets available to pay the settlement classes' claims are the proceeds of several insurance policies purchased by the defendants. Two have been tendered in full, less litigation expenses to date, and they total approximately $4.1 million dollars. *Id.* at ¶¶ 8–9. The fact that these policies are subject to wasting clauses, *see id.*, which means that the amounts available to satisfy the claims of the plaintiffs would be reduced by

25

litigation expenses, also supports a finding of adequacy of the settlement, since it will reduce litigation costs.  The other policies are assigned to the Physician Settlement Class. This agreement has the support of both the Physician and Patient Settlement Classes, and no class members lodged any opposition to the arrangement.  *See generally* Doc. 67; Doc. 83 at p. 11 ¶ 34.  While there is a potential for a larger judgment, that is not a certainty; the plaintiffs acknowledge the risks of litigating these claims, especially given the developing law related to data breaches and class actions of such claims.  And any such hypothetical larger judgment would almost certainly be uncollectible.

At the fairness hearing, class counsel estimated that after payment of fees, litigation expenses, and class representative service awards, each Physician Settlement Class Member will receive a little over $3,200.[6]  They will also receive significant credits and other non-cash benefits, with a potential value to them of over $5.5 million dollars, Doc. 67-1 at ¶ 3.2, and there is the possibility of a settlement or judgment against the two insurance companies who have denied coverage.  After similar deductions, each Patient Settlement Class member will likely receive somewhere between $60 and $150, depending on the number of out-of-pocket claims that are approved.[7]

---

[6] Elsewhere in this Order, the Court has approved attorneys' fees of $486,816.50, expenses of $4,102.97, and representative service awards of $190,000.  Administration Expenses are expected to total about $132,300.  Subtracting those amounts from the Physician Settlement Class Fund of $1,460,449.50, leaves approximately $647,230.  Some 199 entities have submitted Physician Claim Forms to date, so assuming each is valid, the *pro rata* payment for each class member will be approximately $3,250.

[7] Elsewhere in this Order, the Court has approved attorneys' fees of $872,261 and representative service awards of $5,000.  Administration Expenses are expected to total about $386,450.  To date, 178 class members have submitted claims for out-of-pocket losses; those are

There is no actual conflict between or among the settlement classes. *See supra* at 17. There are different insurance policies with different coverage funding the settlements of the two classes, and the physician subclasses are treated equally.

Under Rule 23(e)(2), a court must ensure that a class action settlement is fair, reasonable, and adequate before approving it. FED. R. CIV. P. 23(e)(2). Any settlement between the Physician Settlement Class and one or both of the insurance companies that have denied coverage is subject to court oversight. If and when any such settlement is reached, Physician Settlement Class Counsel must file a supplemental brief providing details about the settlement for court review before disbursing funds to class members, or showing why such review is not necessary under the circumstances then-existing. This requirement does not impede or delay the final approval of the entire settlement as reached.

The factors weigh in favor of finding that the settlement is adequate. The settlement is also reasonable because it conserves the limited resources from the insurance policies for the maximum benefit of the plaintiff classes. The settlement is fair and reasonable.

## IV.     Sufficiency of Notice

"In the context of a class action, the due process requirements of the Fifth Amendment require reasonable notice combined with an opportunity to be heard." *Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 472 (W.D. Va. 2011) (cleaned up).

---

subject to review and approval by the Settlement Administrator. Class counsel represented at the fairness hearing that the usual approval rate for such claims is around 25%.

For classes certified under Rule 23(b)(1)(B), courts "may direct appropriate notice to the class." FED. R. CIV. P. 23(c)(2)(A).

The court-approved notice process was reasonable and provided the class members with adequate notice. The Settlement Administrator sent email notice to each class member for whom it had a valid email address. Doc. 83 at p. 5 ¶ 15. Given the nature of the claims, use of email notice was particularly likely to be effective. If a Physician Settlement Class Member did not have an email address on file or the email bounced back, the Settlement Administrator took steps to ensure it had a valid mailing address, *id.* at p. 6 ¶ 19, and then sent a postcard notice via first class mail.[8] *Id.* at p. 6 ¶ 18. If mail was returned as undeliverable, the Settlement Administrator worked to obtain updated contact information and, when it did, sent the postcard notice a second time. *Id.* at p. 7 ¶ 20. In total, the Settlement Administrator sent notice, either via email or postcard, to 4,629,204 Patient Settlement Class Member addresses and 12,789 to Physician Settlement Class Member addresses. *Id.* at pp. 5–6 ¶¶ 15, 18.

The Settlement Administrator implemented an internet digital notice campaign, which generated more than 71.4 million impressions from November 16, 2023, through December 15, 2023. *Id.* at pp. 7–9 ¶¶ 22–30. The Settlement Administrator also maintained a website, toll-free telephone number, and postal mailing address for class

---

[8] Given the costs, the Settlement Administrator did not mail postcard notices to Patient Settlement Class Members whose emails bounced back. Doc. 83 at p. 4 ¶ 12. Instead, when the Settlement Administrator's emails to these potential members were returned, it made at least two additional attempts to deliver the notice by email. *Id.* at p. 6 ¶ 17. The digital notice campaign discussed *infra* was designed to provide notice to such class members.

28

members, and received many thousands of web visits and calls from class members, *id.* at pp. 10–11 ¶¶ 31–33, further indicating that notices were received.  A paper long-form notice and patient or physician claim form were mailed to all persons who so requested. *Id.* at p. 7 ¶ 21.

The notice period began on November 16, 2023, and for potential class members receiving email notices, it ended on December 16, 2023.  *Id.* at p. 5 ¶ 15, Doc. 75 at p. 4 ¶ 9.  For the 479 potential Physician Settlement Class Members for whom a valid email address was not available or for whom email notice was undeliverable, the notice period extended to January 12, 2024, when the Settlement Administrator sent each a postcard notice.  Doc. 83 at p. 6 ¶ 18.  All class members were told how to object, that final approval will bind class members, and the date of the final settlement hearing.  *Id.* at p.26.  Patient Settlement Class Members and Physician Settlement Class Members notified by email had until January 15, 2024, to object to the settlement, *id.* at p. 11 ¶ 34; Doc. 75 at p. 4 ¶ 10, and Physician Settlement Class Members who were sent a postcard notice had until May 24, 2024, to object.  Doc. 81 at 2; Doc. 83 at p. 11 ¶ 34.  The significant number of inquiries from class members and the number of claims already filed indicates that notice was widely received.  Doc. 83 at p. 11 ¶ 35.  The notice was reasonable and satisfies the requirements of due process.

## V.    Attorneys' Fees and Expenses

In a class action, "the court may award reasonable attorney's fees and nontaxable costs as authorized by law or by the parties' agreement."  FED. R. CIV. P. 23(h).  When an attorney recovers a common fund for the benefit of a class, counsel "is entitled to a

reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

Courts calculate attorneys' fees in class actions using either the "lodestar" method or the "percentage of fund" method. *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 758 (S.D.W. Va. 2009). In a common fund case, "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). The Fourth Circuit does not require the use of the percentage of fund method, but district courts in this circuit overwhelmingly apply it. *See Phillips v. Triad Guaranty Inc.*, No. 9-CV-71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016); *see also Jones*, 601 F. Supp. 2d at 758 (collecting cases).

To determine the reasonableness of the fee award, courts assess the factors identified in *Barber v. Kimbrell's, Inc.* or a variant of those factors.[9] *See* 577 F.2d 216, 226 n.28 (4th Cir. 1978); *Phillips*, 2016 WL 2636289, at *3–4. The *Barber* factors are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length

---

[9] Class counsel apply the *In re The Mills Corp. Sec. Litig.* factors in their briefings. *See, e.g.*, Doc. 85 at 10–11. The Court will apply the *Barber* factors, but many of the *Mills* factors are reflected in the factors identified in *Barber*. *Compare Barber*, 577 F.2d 216, 226 n.28 (4th Cir. 1978), *with In re The Mills*, 265 F.R.D. at 261; *see also Phillips v. Triad Guaranty Inc.*, No. 9-CV-71, 2016 WL 2636289, at *4 (M.D.N.C. May 9, 2016) (acknowledging the overlap of factors).

of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

577 F.2d at 226 n.28 (adopting factors from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92–93 (1989)).

### A. Application of Barber Factors

Both the Physician and Patient Settlement Class Counsel have filed motions seeking attorneys' fees. Doc. 89; Doc. 84. When assessing such motions, the Fourth Circuit has "noted that the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 247 (4th Cir. 2010) (cleaned up).

### 1. Physician Settlement Class Attorneys' Fees

Physician Settlement Class Counsel ask for one-third of the $1,460,449.50 common fund in attorneys' fees, or $486,816.50, and one-third of any future cash that may be obtained through insurance coverage to pay all attorneys and law firms involved on behalf of the named plaintiffs and the Physician Settlement Class. Doc. 90 at 2; Doc. 89 at 2. This is reasonable and fair.

First, Physician Settlement Class Counsel successfully negotiated an early and reasonable settlement that will provide cash benefits to all class members. Their work in this unusually complex case benefits the class. There was a complicated state receivership action, limited funds, and another lawsuit brought by their own patients. Physician Settlement Class Counsel had to negotiate and craft an atypical settlement

31

arrangement to be funded only with proceeds of insurance policies, *see* Doc. 67 at 3, 17–18; Doc. 67-10 at ¶¶ 8–9, and structured to include mandatory, non-opt-out classes. Doc. 67-13 at ¶ 13.

Physician Settlement Class Counsel spent substantial time and labor resolving this matter. Doc. 90 at 2. They investigated the data breach, conducted extensive research, drafted the complaints and motions, and represented the class in settlement negotiations. Doc. 90-1 at ¶¶ 11–13. To date, they have spent at least 706 hours working on this case, *id.* at ¶ 6, and will devote additional time to ensure the settlement agreement is appropriately implemented.

Physician Settlement Class Counsel also had to engage internal counsel with substantial experience in bankruptcy law to protect the Class's interests during bankruptcy proceedings about the sale of the defendants' assets. *Id.* at pp. 2–3 ¶ 6, p. 11. Without this work, the class probably would have lost substantial benefits from the settlement. The time and effort counsel put into this case prevented them from pursuing other matters, and this investment of time supports the requested award.

The presence of new and complex legal questions as well as the experience, reputation, and ability of Physician Settlement Class Counsel in this area of law support the award amounts. Unauthorized data disclosures present novel and complex questions of law. Mr. Ferguson, Mr. Tilley, and Mr. Spaugh have more than 35 years of combined experience in business and complex litigation, including class actions involving medical records data. Doc. 67-13 at ¶¶ 3–6.

Physician Settlement Class Counsel request an award of attorneys' fees equal to one-third of the settlement fund. Doc. 90 at 2. Courts in the Fourth Circuit have found awards of approximately one-third of the class fund to be reasonable. *See, e.g.*, *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022) (affirming fee award of 43% of common fund but acknowledging it approached "the upper limit of permissible recovery"); *Kruger v. Novant Health, Inc.*, No. 14-CV-208, 2016 WL 6769066, at *2 (M.D.N.C. Sept. 29, 2016); *Chrismon v. Pizza*, No. 19-CV-155, 2020 WL 3790866, at *5 (E.D.N.C. July 7, 2020). The amount sought is also comparable to awards in other data privacy class actions. *See, e.g.*, *Lamie v. LendingTree, LLC*, No. 22-CV-307, 2024 WL 811519, at *2 (W.D.N.C. Feb. 27, 2024); *Thomsen v. Morely Cos.*, No. 22-CV-10271, 2023 WL 3437802, at *2 (E.D. Mich. May 12, 2023); *In re Forefront Data Breach Litig.*, No. 21-CV-887, 2023 WL 6215366, at *8 (E.D. Wis. Mar. 22, 2023).

It is particularly reasonable here, for three additional reasons. First, the effective hourly rate is well within or even below comparable hourly rates for similar work. *See, e.g.*, *In re Novant Health, Inc.*, No. 22-CV-697, 2024 WL 3028443, at *12 (M.D.N.C. June 17, 2024).[10] It is close to or barely above the fees counsel would charge at their usual hourly rates. Second, counsel have agreed to repay the fees paid by some of the

---

[10] Courts that apply the percentage of funds method can also conduct a lodestar cross-check to evaluate the reasonableness of an attorneys' fee award. *Phillips*, 2016 WL 2636289, at *7. To calculate a lodestar figure, courts multiply a reasonable hourly rate times the hours reasonably expended. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). "The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar." *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 467 (D. Md. 2014).

class representatives at the beginning of the case. Doc. 90 at 12–13. Finally, counsel have not sought a higher percentage of the settlement based on the potential value of the credits and other non-cash benefits; when that is taken into account, the fee request is well below one-third of the settlement value. *Id.* at 15.

The fee award is customary and typical of like awards. Under the *Barber* factors, the requested award of $486,816.50 for the Physician Settlement Class is reasonable.

There is a second, more unusual aspect to the motion for attorneys' fees. Physician Settlement Class Counsel seek approval in advance of a fee of one-third from any recovery counsel is able to obtain from the two insurance companies that have denied coverage. *Id.* at 15.

In *Barber*, the court emphasized that 15 U.S.C. § 1640(a)(3) permits "a successful plaintiff" to recover a reasonable attorneys' fee as determined by the court and that district courts have discretion to award attorneys' fees because the trial judge "has close and intimate knowledge of the efforts expended and the value of the services rendered." 577 F.2d at 226. As already discussed in detail, *supra* at 32–34, Physician Settlement Class Counsel managed this complex case well and successfully negotiated a settlement agreement early, which preserved a substantial portion of the limited funding available for the class members. Counsel's diligence during unanticipated bankruptcy proceedings was also critical to preserving the class members' benefits under the agreement. Physician Settlement Class Counsel here have already achieved success for the plaintiffs and the Physician Settlement Class, and any additional recovery from the insurance companies for the benefit of the Class would make their representation more successful.

34

The fee requested for any future settlement is well within the range of what is a usual and customary contingency fee for this kind of work and motivates counsel to obtain the best recovery possible for the Physician Settlement Class. No class member objected to this aspect of the settlement. Under these very unusual circumstances, Physician Settlement Class Counsel's request for attorneys' fees in advance is appropriate and will be granted.

### 2. Patient Settlement Class Attorneys' Fees

Patient Settlement Class Counsel ask for one-third of the $2,616,783 common fund in attorneys' fees, or $872,261.[11] Doc. 85 at 1–2. For a number of reasons similar to those just discussed for the Physician Settlement Class Counsel motion, these requests are reasonable. Patient Settlement Class Counsel successfully negotiated an atypical settlement agreement, funded with the proceeds of insurance policies, *see* Doc. 67 at 3, 17–18, that provides for the creation of a $2,616,783 settlement fund for the Patient Settlement Class. *Id.* at 19. Since there were only limited funds available, counsel worked to secure an agreement that includes non-opt-out settlement classes. Doc. 67-12 at ¶¶ 20–21.

Patient Settlement Class Counsel spent substantial time and labor resolving this case and obtained an appropriate settlement amount. Doc. 85 at 11, 19. They spent more than 576 hours on the case and expect to dedicate at least another 75 hours. Doc. 85-1 at ¶¶ 11–12. Patient Settlement Class Counsel investigated the data breach, conducted extensive research, drafted the complaints and motions, and represented the class in

---

[11] Counsel for the Patient Settlement Class request $872,173.77 for attorneys' fees. Doc. 85 at 2. The Court's independent calculation shows that one-third of $2,616,783 is $872,261.

35

settlement negotiations.  *Id.* at ¶ 2.  This investment of time has prevented counsel from pursuing other matters, which further supports granting the requested award.

The new and complex legal questions presented along with the experience, reputation, and ability of Patient Settlement Class Counsel in this area of law support the award amounts.  Unauthorized data disclosures present novel and complex questions of law, *id.* at ¶ 8, and the Patient Settlement Class Counsel are uniquely well-qualified to litigate in this area.  The Patient Settlement Class lead counsel has more than two decades of experience with complex litigation, including consumer class actions, and together the class counsel team has notable experience in class actions involving data breach litigation.  Doc. 67-12 at ¶¶ 2–7.

Patient Settlement Class Counsel represent that they have obtained similar settlement amounts in class actions concerning data breaches, including those involving medical and health care information.  *See, e.g.*, *id.* at ¶¶ 3, 6–7.  Jean Sutton Martin has served as co-lead counsel on two unauthorized data disclosure cases similar to this case and obtained comparable settlements in both.  *Id.* at ¶ 3.  She also cites several other unauthorized data disclosure class actions that Gary Mason and Gary Klinger led and in which they obtained settlement amounts on par with what the parties have agreed to here. *Id.* at ¶¶ 6–7.

Patient Settlement Class Counsel request an award of attorneys' fees equal to one-third of the settlement funds.  Doc. 85 at 1–2.  As discussed *supra* at 33–34, courts in the Fourth Circuit have found awards of approximately one-third of the class fund to be

reasonable, *see, e.g.*, *McAdams*, 26 F.4th at 162, and the amount sought is comparable to awards in other data privacy class actions. *See, e.g.*, *Lamie*, 2024 WL 811519, at *2.

A lodestar comparison, *see supra* at 34 n.10, confirms that the requested attorneys' fees are reasonable. Counsel will be compensated above their typical hourly rate, but the multiplier is well under two. *See* Doc. 85-1 at ¶ 11. That multiplier is fair given the inherent risk in undertaking the work on this case. *See, e.g.*, *id.* at ¶ 9.

The fee award is customary and typical of like awards. Under the *Barber* factors, the requested award $872,261 for the Patient Settlement Class Counsel is reasonable.

## B. Firm Expenses

Federal Rule of Civil Procedure 23(h) allows courts approving class action settlements to award nontaxable costs authorized by law or by the parties' agreement. FED. R. CIV. P. 23(h). Courts in the Fourth Circuit will allow reasonable, litigation-related expenses to be paid from the common fund, in addition to the fee award. *See Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 483 (D. Md. 2014); *Binotti v. Duke Univ.*, No. 20-CV-470, 2021 WL 5366877, at *5 (M.D.N.C. Aug. 30, 2021). The expenses requested here are reasonable.

Physician Settlement Class Counsel request $4,102.97 in litigation expenses. Doc. 89 at ¶ 3; Doc. 90-1 at ¶ 8. Travel to attend court hearings was the primary reason for these costs. Doc. 90-1 at ¶ 8. This is in addition to the attorneys' fee award approved.

Patient Settlement Class Counsel request an award of $5,828.79 in litigation expenses, including for past travel expenses. Doc. 85-1 at ¶¶ 17–18. These will be paid out of the attorneys' fees awarded to Patient Settlement Class Counsel. Doc. 84 at 2.

37

## VI.    Service Awards

Service awards are "fairly typical in class action cases." *Berry*, 807 F.3d at 613 (cleaned up).  They are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize [the representatives'] willingness to act as a private attorney general." *Id.* (cleaned up).  Service awards also "encourage socially beneficial litigation;" if not for the class representatives, class members would receive nothing. *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 472 (S.D.W. Va. 2010).

The Physician Settlement Class Counsel request a service award of $40,000 each to the initial named plaintiffs, Alliance Ophthalmology, PLLC, Dallas Retina Center, PLLC, and Texas Eye and Cataract, PLLC; $20,000 to Hofacre Optometric Corporation, which was added as a named plaintiff in the Second Amended Complaint; and $10,000 each to Shulkin Eye Associates, Gorden Eye Associates PA, Regional Eye Associates, Inc., Eye Associates, LLC, and SurgiCenter of Vineland Holdings, LLC, entities that engaged counsel seeking relief separately from the initial named plaintiffs.  Doc. 89 at ¶ 4; Doc. 67-1 at ¶ 2.14 (parties' agreement).  These representatives have been involved and active in this case.  Doc. 90-1 at ¶¶ 10–16, 18–20, 24–27.

Alliance, Dallas Retina, and Texas Eye have assisted in the investigation and development of the case since 2021, *id.* at ¶¶ 10–12, and each helped fund the litigation to support the initial factual investigation and legal research. *Id.* at ¶ 14.  Each of these entities has played a significant role in this litigation.  Hofacre joined the litigation later than the initial three entities but also undertook extensive work to investigate and prepare

its claims. *Id.* at ¶ 25. The remaining entities, Shulkin Eye Associates, Gorden Eye Associates PA, Regional Eye Associates, Inc., Eye Associates, LLC, and SurgiCenter of Vineland Holdings, LLC, supported the litigation efforts, particularly by contributing to the review and evaluation of the settlement agreement. *Id.* at ¶ 26.

The amounts of the requested service awards were set forth in the settlement agreement, Doc. 67-1 at ¶ 2.14, and in the long-form notice to the class. Doc. 83 at p. 42 ¶ 15. No class member has objected. *Id.* at p. 11 ¶ 34. The varying award amounts reflect the differing roles each representative played and the significant commitment of time and resources required to serve as class representatives. And Alliance, Dallas Retina, and Texas Eye will receive the largest awards to account of the fact they provided initial funding to support the litigation. Doc. 90-1 at ¶ 14. Amounts at this general level have been approved in other class actions of similar complexity. *See Hollis v. Valley Proteins Inc.*, No. 21-CV-112, 2022 WL 703606, at *8 (W.D.N.C. Mar. 8, 2022) (approving class service awards on a sliding scale of $2,000 up to $100,000 to named plaintiffs); *Kruger*, 2016 WL 6769066, at *6 (approving $25,000 service award for each of the seven class representatives).

Patient Settlement Class Counsel request a service award of $1,000 per class representative. Doc. 85-1 at ¶ 19; Doc. 67-1 at ¶ 2.14 (parties' agreement). The five class representatives have been involved and active in this case. Doc. 85-1 at ¶ 19. They assisted in the investigation of the case, communicated consistently with counsel, reviewed the pleadings, answered questions from counsel, and reviewed the terms of the settlement agreement. *Id.*

39

The proposed service awards are reasonable based on the time these tasks would reasonably take. They are also reasonable compared to other service awards approved in this district and the Fourth Circuit. *See Hollis*, 2022 WL 703606, at *8; *Kruger*, 2016 WL 6769066, at *6; *Kay*, 749 F. Supp. 2d at 473 (finding requested award too high and granting award of $15,000 per plaintiff for six named plaintiffs). The $40,000 awards for Alliance, Dallas Retina, and Texas Eye are high, but they are justified in this context and on the facts here. The proposed service awards are appropriate.

## VII.    Settlement Administration Fees

The Settlement Administrator will be paid from each of the settlement funds. Doc. 67-1 at ¶ 3.13. The joint administration of the settlement for both Settlement Classes has avoided duplicative costs while still allowing the Settlement Administrator to apportion costs to each settlement fund appropriately. Doc. 67-12 at ¶ 25. At the fairness hearing, class counsel represented that administration costs were higher than costs accrued in similar class action settlements because of the need for the Settlement Administrator to manage the data received from the defendants as part of identifying and notifying millions of potential class members. The Court is otherwise familiar with the quality of the data the defendants have been able to provide, which has been affected by the state court receiverships. Because of the size of the class and the complexities of the data review, the settlement administration fees here are appropriate.

## VIII.    Determination of *Cy Pres* Recipient(s)

The settlement agreement does not address what might happen to any unpaid funds. But the parties have since agreed to a *cy pres* distribution.

40

At the fairness hearing, counsel stated that they do not anticipate that money will remain after the distribution. Because the notice plan required class members to submit claims for payment, counsel believe class members will be likely to cash issued checks. If there is remaining funding after the first disbursement, the Settlement Administrator in coordination with counsel will oversee a second disbursement to class members who cashed their first check, if economically feasible. Counsel estimated that a second-round disbursement would be feasible if the payment were for at least $5 per class member.

If the remaining amount does not meet that level and is thus *de minimis*, or if there are funds left after a second-round distribution, Counsel shall file a motion to seek approval for a *cy pres* distribution.

## IX. Conclusion

Final approval of this class action settlement is appropriate. The requirements of Rule 23 are met, and settlement is in the best interests of the class members. The request for attorneys' fees, expenses, and service awards is also reasonable. Final judgment is entered concurrently.

For these reasons and based on the record, it is **ORDERED and ADJUDGED** that:

1. The joint motion for Final Approval of Class Action Settlement and Certification of Rule 23(b)(1)(B) Classes, Doc. 87, is **GRANTED**.

2. The plaintiffs' motion for attorneys' fees, expenses, and service awards in No. 22-CV-468, Doc. 84, is **GRANTED** as follows:

41

a.  Patient Settlement Class Counsel's request for attorneys' fees in the amount of $872,261, inclusive of expenses, to be paid from the settlement fund is **GRANTED**.

b.  The class representatives' request for service awards of $1,000 each to be paid to Kimberly Farley, Chad Forrester, Kimberly Sandvig, Detrina Solomon, and Jeanne Byers from the settlement fund is **GRANTED**.

3.  The plaintiffs' motion for attorneys' fees, reimbursement of costs, and class service awards in No. 22-cv-296, Doc. 89, is **GRANTED** as follows:

a.  Physician Settlement Class Counsel's request for attorneys' fees in the amount of $486,816.50 to be paid from the settlement fund is **GRANTED**.

b.  Physician Settlement Class Counsel's request for reimbursement of $4,102.97 in expenses to be paid from the settlement fund is **GRANTED**.

c.  The request for class representative service awards of $40,000 each to Alliance Ophthalmology, PLLC, Dallas Retina Center, PLLC, and Texas Eye and Cataract, PLLC; $20,000 to Hofacre Optometric Corporation; and $10,000 each to Shulkin Eye Associates, Gorden Eye Associates PA, Regional Eye Associates, Inc., Eye Associates, LLC, and SurgiCenter of Vineland Holdings, LLC, is **GRANTED**.

4. Upon the effective date defined in the settlement agreement, the releasing persons, including the plaintiffs and each settlement class member, **SHALL** release and forever discharge the released persons from the released claims, as set forth in the parties' settlement agreement.

5. The Settlement Administrator **SHALL** make all required payments from the settlement fund in accordance with the amounts and the times set forth in the settlement agreement and this Order, including all payments to settlement class members who submitted an approved claim, for the attorneys' fees and costs, for the service awards, and for settlement administration costs.

6. All funds held by the Settlement Administrator **SHALL** be deemed and considered to be *in custodia legis* of the Court and shall remain subject to the jurisdiction of the Court until such time as the funds are distributed pursuant to the settlement or further order of the Court.

7. No later than November 25, 2024, the Settlement Administrator **SHALL** file a status report detailing the amounts distributed and for what purpose and any funds remaining.

8. If there are undistributed funds after the Settlement Administrator makes the initial disbursement, the parties shall assess whether a second-round disbursement is economically feasible. If so, the Settlement Administrator may make a second disbursement to all class members who cashed their checks or the equivalent. If such disbursement is not economically

43

feasible, or if there are *de minimis* funds after a second-round disbursement, the parties **SHALL** meet and confer about a *cy pres* recipient and promptly file a motion. The Court further retains jurisdiction to approve a *cy pres* recipient or recipients.

9. The Court hereby enters **FINAL JUDGMENT**, and all claims are **DISMISSED** with prejudice.

10. Without affecting the finality of the Judgment entered, the Court reserves jurisdiction over the implementation of the settlement, including enforcement and administration of the settlement agreement.

11. The parties shall bear their own costs except as provided by the settlement agreement and as ordered herein.

12. If and when the Physician Settlement Class Counsel and the Physician Settlement Class Representatives settle a claim against an insurance company on an assigned policy, Physician Settlement Class Counsel **SHALL** file a supplemental brief providing details about the settlement before distribution of funds to class members and seek an appropriate court order.

This the 27th day of June, 2024.

_____
UNITED STATES DISTRICT JUDGE